STATE OF CONNECTICUT *v.* JOHN J. BROSNAN
(14297)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO,
BORDEN and BERDON, Js.

Argued December 3, 1991—decision released April 28, 1992

*Marjorie Allen Dauster,* deputy assistant state's attorney, with whom, on the brief, were *C. Robert Satti, Sr.,* state's attorney, *Peter McShane,* deputy assistant state's attorney, and *Sarah Taffel,* law student intern, for the appellant (state).

*Jacques J. Parenteau,* for the appellee (defendant).

BORDEN, J. The principal issue in this appeal is whether an overnight guest in another's home has a limited right to resist an illegal entry by the police into the bedroom that he is occupying. After a jury trial, the defendant, John J. Brosnan, was convicted[1] of two counts of interfering with an officer in violation of General Statutes § 53a-167a (a),[2] and of one count of criminal mischief in the third degree in violation of General Statutes § 53a-117 (a) (1) (A).[3] He appealed from that judgment of conviction to the Appellate Court, which reversed the judgment and ordered a new trial on the

---

[1] The defendant was charged in a six count information. In the first count he was charged with interfering with an officer, in violation of General Statutes § 53a-167a (a), on September 23, 1989, "at approximately 4:00 a.m. at 359 Long Hill Road," in Groton. In the second count he was charged with interfering with an officer on the same date, at approximately the same time, "at the Groton Town Police Department." In the third count he was charged with disorderly conduct, in violation of General Statutes § 53a-182 (a) (2), by provoking and being physically aggressive toward police officers "at approximately 4:00 a.m. at 359 Long Hill Road in the Town of Groton." In the fourth count he was charged with disorderly conduct, in violation of General Statutes § 53a-182 (a) (3), by discharging fireworks and thus making unreasonable noise, "at approximately 4:00 a.m. at 359 Long Hill Road" in Groton. In the fifth count he was charged with criminal mischief in the third degree, in violation of General Statutes § 53a-117 (a) (1) (A), by intentionally and recklessly damaging property "at approximately 4:00 a.m. . . . . at the Groton Town Police Department." In the sixth count he was charged with illegal possession of fireworks, in violation of General Statutes § 29-357 (a), "at approximately 4:00 a.m. . . . at 359 Long Hill Road" in Groton.

The trial court dismissed the third count, and the jury found the defendant not guilty on the fourth and sixth counts, and guilty on the first, second and fifth counts. The court rendered judgment accordingly. Thus, the defendant was convicted of interfering with an officer at 359 Long Hill Road, interfering with an officer at the Groton police department and criminal mischief at the Groton police department.

[2] General Statutes § 53a-167a (a) provides: "A person is guilty of interfering with an officer when he obstructs, resists, hinders or endangers any peace officer or fireman in the performance of his duties."

[3] General Statutes § 53a-117 (a) (1) (A) provides: "A person is guilty of criminal mischief in the third degree when, having no reasonable ground to believe that he has a right to do so, he: (1) Intentionally or recklessly (A) damages tangible property of another . . . ."

first count of interfering with an officer at 359 Long Hill Road in Groton. With respect to the second and fifth counts of interfering with an officer and criminal mischief at the Groton police department respectively, the Appellate Court remanded the case to the trial court to hold a hearing in order to determine whether the erasure by the police of a certain videotape of the defendant's conduct at the police station had been done in bad faith. *State* v. *Brosnan,* 24 Conn. App. 473, 485, 589 A.2d 1234 (1991).

Upon our grant of certification to appeal;[4] *State* v. *Brosnan,* 219 Conn. 907, 593 A.2d 134 (1991); the state appealed to this court from the judgment of the Appellate Court. The state claims that the judgment should be reversed because: (1) that court improperly held that the fourth amendment both (a) makes the common law privilege to resist an unlawful entry available to a person when he is not in his own home, and (b) extends the common law privilege of resistance of an illegal entry to resistance of an illegal arrest; (2) if the fourth amendment controls who has a privilege to resist an

---

[4] We granted the state's petition for certification to appeal limited to the following issues: "(1) Did the Appellate Court correctly hold that a person has a common law privilege to use force to resist an illegal entry into a place that is not his home if he has a reasonable expectation of privacy under the fourth amendment in that place? (2) If the fourth amendment controls who has the common law privilege, was the Appellate Court correct in finding that the defendant was an overnight houseguest, thereby failing to defer to the trial court['s] finding of fact to the contrary? (3) If the defendant was entitled to a jury instruction on a privilege to resist an illegal entry, did the Appellate Court correctly hold, when the record was inadequate, that the arrest of the defendant was unlawful instead of remanding the matter for further evidentiary proceedings? (4) Was the Appellate Court correct in using plain error to remand for further proceedings with respect to the destruction of a videotape when the exculpatory value of the lost videotape and actual prejudice to the defendant was wholly speculative?" The first three questions pertain to the conviction of the defendant of interfering with an officer at Long Hill Road, and the fourth question pertains to the convictions of the defendant of interfering with an officer and criminal mischief at the Groton police department.

illegal entry, the Appellate Court improperly determined that the defendant was an overnight guest at the place where he was arrested; (3) if the defendant was entitled to a jury instruction on the privilege to resist an illegal entry, the Appellate Court improperly determined as a matter of law that the entry by the police into the place in question and the subsequent arrest of the defendant were illegal; and (4) the Appellate Court improperly remanded the case to the trial court for further evidentiary findings on whether the police erased the videotape in bad faith. We affirm in part and reverse in part.

The conviction of the defendant arises out of his conduct in the early morning hours of September 23, 1989, while being arrested at the apartment of his neighbor, Lisa Joy Conti, at 359 Long Hill Road, Groton, and his subsequent conduct at the Groton police station following that arrest. As stated by the Appellate Court and as disclosed by the evidence, the jury could reasonably have found the following facts. At approximately 3:15 a.m. on September 23, 1989, Officer John W. Lambert of the Groton police department responded to a complaint that fireworks were being discharged at an apartment complex located at 359 Long Hill Road. Lambert saw the defendant in the parking area. In response to Lambert's questions, the defendant denied any involvement in discharging fireworks, and Lambert left the area. At approximately 4:15 a.m., four Groton police officers—Matthew Morton, William Jervis, Gary L. Pendleton and Timothy Wilbur—responded to a similar complaint. When they arrived at the apartment complex, the complainant directed the attention of Morton to a first floor window facing the parking lot, and told the officer that fireworks had been discharged from that window. The complainant also told the officers that the defendant had just run back into the building shortly before the police had arrived. After the police found

pieces of paper from discharged firecrackers on the ground in front of the window and the remains of exploded bottle rockets in the parking lot, Morton looked in the window and saw red cellophane wrappings on a bedroom floor and the fully clothed defendant lying on a bed.

The officers determined that the window was located in apartment eleven. Morton and Jervis went to the front door of the apartment, while Pendleton and Wilbur knocked at the rear sliding door. The tenant, Conti, answered the rear door. As Pendleton and Wilbur entered through the rear door of the apartment, Morton and Jervis entered through the front door. Morton and Pendleton then entered the bedroom, while Jervis and Wilbur stood at the bedroom door. The defendant was asleep.[5] Morton and Pendleton shook the defendant to awaken him, and told him to get up because he was under arrest. The defendant was groggy and smelled of alcohol. When they attempted to pull him from the bed, the defendant attempted to break free and a struggle ensued. That struggle was the basis for the conviction on the first count of interfering with an officer.

The police took the defendant to the police station, where a second struggle ensued in the booking room. During that struggle, the defendant kicked a computer, breaking a key that was in the lock of the computer. That struggle and the damage to the computer and the key were the bases for the convictions of interfering with an officer, on the second count, and of criminal mischief, on the fifth count.

In his appeal to the Appellate Court, the defendant's principal claim was that the trial court "improperly

[5] Although Morton testified, contrary to the testimony of the other officers, that he believed that the defendant was not asleep, our decision does not turn on whether the defendant was asleep or awake when the police officers entered the bedroom.

refused to charge the jury on the common law privilege to resist an unlawful arrest in the home." *State* v. *Brosnan,* supra, 24 Conn. App. 476. The defendant had filed a request that the court charge the jury that, since the defendant was being arrested for misdemeanors only, and since the fourth amendment, in the absence of consent, prohibits police from entering a suspect's home, without a warrant,[6] to make an arrest, the jury must find that the arrest of the defendant was unlawful, and that his resistance was privileged so long as that resistance did not amount to an assault on the police officer.[7] The trial court declined to charge

---

[6] It is undisputed that the police had neither a search warrant nor arrest warrant when they entered Conti's apartment.

[7] The entire request to charge was as follows: "As I have previously advised you, John J. Brosnan is accused of the crime of resisting arrest. The fourth amendment to the United States Constitution, made applicable to the state by the fourteenth amendment, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine misdemeanor arrest. I charge you that John Brosnan had been charged with misdemeanors. At common law reasonable resistance to an unlawful arrest was privileged conduct. Coupling an unlawful arrest with an unlawful entry adds to the seriousness of the government's intrusion because of the recognized privacy interest that attaches to a private home. In such circumstances it is reasonable to view the governmental intrusion as especially provocative and [the] defendant's resistance to entry and arrest as excusable and therefore privileged. Courts have recognized a greater privilege to resist an unlawful entry into private premises than to resist an unlawful arrest in a public place. Therefore, an unlawful, warrantless intrusion into the home creates a privilege to resist and punishment of such resistance is therefore improper. In other words, there is a constitutional right to resist unlawful, warrantless entry under the United States Constitution based upon the expectation of privacy in the home which underlies the common law right. The more patently unlawful the intrusion, the more excusable the resistance becomes. So, there is a right to resist an unlawful arrest so long as the resistance does not rise to the level of an assault. Therefore, if you find that the police did not have a warrant to arrest John Brosnan at the time they entered Lisa [Conti's] apartment and that there was no consent to allow that entry, then you must find that John J. Brosnan's arrest was unlawful and his resistance a privilege so long as you do not find that the resistance amounted to an assault upon the police officer. *State* v. *Gallagher,* 191 Conn. 433 [465 A.2d 323] (1983)."

the jury in accordance with that request.[8] The Appellate Court agreed with the defendant that he was entitled to such an instruction. Id., 477.

The Appellate Court's conclusion was based upon certain facts that it took to have been established in a hearing on the defendant's unsuccessful motion to suppress evidence that the police had seized from the bedroom at the time of the defendant's arrest.[9] The Appellate Court reasoned that, because the defendant was an overnight guest in Conti's apartment, he had a reasonable expectation of privacy in the apartment; see *Minnesota* v. *Olson,* 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); and, therefore, was entitled to claim the protection of the fourth amendment. *State* v. *Brosnan,* supra, 24 Conn. App. 478–79. The court reasoned further that, because the fourth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony or misdemeanor arrest; see *Payton* v. *New York,* 445 U.S. 573, 576, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Gallagher,* 191 Conn. 433, 437 n.4, 465 A.2d 323 (1983); the arrest of the defendant in Conti's apartment was unlawful. *State* v. *Brosnan,* supra, 24 Conn. App. 480.

Since, in the Appellate Court's view, the arrest was unlawful and occurred within Conti's apartment where the defendant had a reasonable expectation of privacy,

[8] It is apparent from the record that the trial court based its refusal to charge the jury as requested by the defendant on its earlier ruling, made in the context of the defendant's motion to suppress the evidence seized from the bedroom, that the defendant had no reasonable expectation of privacy in the bedroom. Consistent with this ruling, the trial court also sustained the state's objections to the defendant's questions of the police officers regarding the legality of their entry into the apartment.

[9] It was unnecessary for the Appellate Court to review the defendant's claim regarding the trial court's denial of his motion to suppress because the evidence seized related only to the counts on which he had been acquitted. *State* v. *Brosnan,* 24 Conn. App. 473, 474 n.3, 589 A.2d 1234 (1991).

the court held that, under *State* v. *Gallagher,* supra, 441, General Statutes § 53a-23,[10] which prohibits the use of physical force to resist an arrest, whether legal or illegal, did not abrogate the defendant's common law privilege to resist an illegal entry into the home. The court read *Gallagher* to express a rule that "with respect to entries made into a place where the occupant enjoys a fourth amendment right, that occupant has the common law privilege to offer reasonable resistance, not rising to the level of an assault, to an unlawful entry. These issues, including any issue of consent, are properly issues to be resolved by the trier of fact under the totality of all of the circumstances." *State* v. *Brosnan,* supra, 24 Conn. App. 482. Accordingly, the court concluded that the trial court had "improperly refused to charge the jury with respect to the common law privilege on the charge of interfering that was alleged to have occurred at Conti's apartment." Id.

With respect to the convictions of interfering with an officer and criminal mischief at the Groton police station, the Appellate Court undertook plain error review of the defendant's claim, which he had not preserved at trial, and concluded that the case should be remanded to the trial court for a determination of whether the police, in bad faith, had erased a certain videotape of the defendant's conduct in the booking room of the police station. Id., 484. The Appellate Court read the trial court record to establish that, although the defendant had attempted to elicit testimony regarding the erasure of the videotape and the reasons for its erasure, the trial court had sustained the state's objections to such testimony and thus had deprived the defendant of an opportunity to establish that the destruction had been in bad faith. Id., 483–84; see *Ari-*

---

[10] General Statutes § 53a-23 provides: "A person is not justified in using physical force to resist an arrest by a reasonably identifiable peace officer, whether such arrest is legal or illegal."

*zona* v. *Youngblood,* 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S. Ct. 885, 102 L. Ed. 2d 1007 (1989). The Appellate Court concluded that "the [trial] court's refusal to allow the defendant an opportunity to question the circumstances surrounding the destruction of the tape constitutes plain error"; *State* v. *Brosnan,* supra, 24 Conn. App. 484; and remanded the second and fifth counts to the trial court for a hearing to determine whether the destruction was in bad faith. Id.[11] This appeal followed.

I

We first consider the state's challenge to the Appellate Court's reversal of the judgment of conviction on the charge of interfering with an officer at Conti's apartment. This challenge comes to us in three parts.

The first part assumes arguendo that the defendant was an overnight guest in Conti's apartment and that the entry into the apartment was unlawful. Given these assumptions, the state argues that even if the defendant, as an overnight guest, had a reasonable expectation of privacy in the apartment for purposes of the fourth amendment, it was improper for the Appellate Court to measure the scope of the defendant's privilege to resist the entry by the scope of that fourth amendment privacy interest.

The second part of the state's challenge addresses one of the factual assumptions underlying the first part of the challenge, namely, that the defendant was an overnight guest in Conti's apartment. The state argues

---

[11] The Appellate Court further directed the trial court that, if it concluded that the erasure was not in bad faith, the judgment of conviction on those counts should be affirmed; if, however, it concluded that the erasure was in bad faith, the judgment on those counts should be reversed and a new trial granted. *State* v. *Brosnan,* 24 Conn. App. 473, 485–86, 589 A.2d 1234 (1991).

that, even if the entry was unlawful, there was no evidence to support a determination that the defendant was an overnight guest and, in the alternative, if there was such evidence, there was also contrary evidence and that, therefore, the issue should be decided by the jury on a retrial.

The third part of the state's challenge addresses the other assumption underlying the first part of the challenge, namely, that the entry into Conti's apartment was unlawful. The state argues that, even if the fourth amendment defines the scope of the privilege to resist an illegal entry, the Appellate Court invaded the jury's province by holding, as a matter of law, that the entry was unlawful.

A

Despite the order of the state's arguments, we address the second part first, since the critical factual question of the defendant's status as an overnight guest forms the predicate of the trial court's rulings, the Appellate Court's opinion, and the defendant's position in this court. We conclude that, because there was conflicting evidence on this issue in the trial court, the Appellate Court improperly determined, as a matter of law, that the defendant was an overnight guest. The Appellate Court's determination that the defendant was an overnight guest in Conti's apartment was based upon the following evidence, which was produced at the hearing on the defendant's motion to suppress. The defendant and Conti were good friends. He lived in an apartment upstairs from Conti's. He had stayed overnight at Conti's apartment five or six times over a four year period, was a welcome guest there, and on the night in question was in the apartment with her permission and at her invitation. He was asleep when the police entered Conti's bedroom, and he testified that he believed that no one would enter it without her per-

mission and that he felt that being in her apartment was the same as being in his own. Conti testified by deposition that, without her permission, the police had forced their way into her apartment and entered the bedroom.

There was also evidence before the jury, however, that could reasonably form the basis for a finding that the defendant was not an overnight guest on that night. The defendant's girlfriend, Susan E. Ruple, testified that, although she and he had lived together in their Long Hill apartment for four and one-half years, she had never known him to stay overnight at Conti's apartment, and that she had wondered where he was that night. Furthermore, Conti testified in her deposition that both she and her husband were the lessees of the apartment, that on the night in question her husband was in Georgia in the military, that she lived in the apartment with her five year old son, that the defendant had come by to visit her, that he had been drinking, and that he had passed out on her bed. Finally, Morton testified that the defendant had just gone into the apartment and that it was his belief that the defendant was feigning sleep.

Faced with this conflicting evidence as to the defendant's status in Conti's bedroom that night, the Appellate Court improperly determined that the defendant was an overnight guest.[12] On the retrial, that factual issue will have to be decided by the jury.[13]

---

[12] The state argues that the trial court had already made a factual determination that the defendant was not an overnight guest. While the trial court, during the hearing on a motion to suppress, did determine that the defendant was not an overnight guest, that initial factual determination, made for purposes of the motion to suppress, cannot substitute for a similar factual determination that should have been presented to the jury on the basis of conflicting evidence, for purposes of the defendant's defense to the charge of interfering with an officer.

[13] We recognize, as the state suggests, that some of this evidence was adduced only on the defendant's motion to suppress, and was not presented

## B

We next address the third part of the state's challenge to the Appellate Court's decision since, like the second part, this part involves a critical factual question, namely, whether the entry was unlawful. The state argues that since the trial court had ruled that the defendant had no right to contest the entry, it also excluded any inquiry into the legality of that entry, and that the state should be entitled on a retrial to establish the legality of the entry under applicable exceptions to the warrant requirement, such as consent, exigency and emergency. We agree with the state. As a result of the ruling of the trial court that the question of the legality of the police entry into the bedroom was immaterial, the state was not called upon to justify that entry. It should not, therefore, be barred from attempting to do so upon the retrial. We need not decide now whether any exception to the warrant requirement applied; to the extent that, on the retrial, the state adduces sufficient evidence to justify the warrantless entry into the bedroom, the lawfulness of that entry will be a question for the jury under appropriate instructions by the trial court.

## C

We now turn to the state's argument that, even if the defendant was an overnight guest in Conti's apartment and even if the entry was unlawful, the Appellate Court improperly measured his privilege to resist the entry by the scope of his fourth amendment privacy

---

to the jury. Since the trial court had ruled that the defendant had no reasonable expectation of privacy and thus could not challenge the search of the bedroom, however, it precluded any further inquiry before the jury into the issue of the defendant's status in the bedroom. Nonetheless, viewing all the evidence in the trial court, both on the motion to suppress and before the jury, we are persuaded that the evidence was in conflict on whether the defendant was an overnight guest.

interest. The state contends that the proper inquiry is not whether the defendant had a protected privacy interest under the fourth amendment, but whether he had a common law privilege to resist such an entry. Since the defendant was essentially a visitor to Conti's apartment, as opposed to someone living there— such as a tenant, a member of her family or a lodger— the state argues that he had no common law privilege to resist an unlawful entry, and therefore no right to a jury instruction on that privilege.

The issue here is whether the defendant was entitled to an appropriate jury instruction on the privilege to resist an unlawful entry. He was "entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . ." (Internal quotation marks omitted.) *State* v. *Belle,* 215 Conn. 257, 275, 576 A.2d 139 (1990). It is undisputed that the police had no warrant to enter Conti's apartment, and thus no warrant to enter the bedroom, in order to make the misdemeanor arrest of the defendant. In addition to the evidence already referred to, there was evidence introduced through Conti's deposition, which was read to the jury,[14] that when Conti responded to the knock on her back door, the defendant had been lying on her bed, that she knew that the police had looked in her bedroom window and had seen him there, that the police had asked her "where the guy was," and that she had told them that he had been drinking and that he had "passed out." She also testified before the jury that the police had not asked her if they could enter her apartment before doing so. Furthermore, she tes-

[14] Conti was out of state at the time of the trial, and her testimony had been preserved by a deposition. Portions of it were read to the jury, and the court ruled on objections at that time, and portions of it were introduced only on the motion to suppress. References herein to Conti's testimony, therefore, refer to that deposition testimony.

tified in her deposition, albeit not before the jury, that the police had forced their way into the apartment.[15] Finally, there was evidence that Morton and Pendleton had entered the apartment through the front door, which was either ajar or unlocked, without Conti's consent. Thus, there was evidence in the trial court that the police made a warrantless, nighttime, forceful entry into Conti's apartment and bedroom, without her consent, in order to make an arrest of the defendant. The defendant's claims must be evaluated on the basis of this factual background.

We pause, however, to note what we do not decide. We do not decide that under all circumstances a defendant's fourth amendment reasonable expectation of privacy in any place affords him a corresponding privilege to resist an unlawful entry into that place, nor do we read *Gallagher* to stand for such a broad proposition. Thus, we do not endorse the suggestion of the Appellate Court "that, with respect to entries made into a place where the occupant enjoys a fourth amendment right, that occupant has the common law privilege to offer reasonable resistance, not rising to the level of an assault, to an unlawful entry." *State* v. *Bros-*

---

[15] Conti testified in her deposition that the police had "forced their way into my apartment." The court sustained the state's objection to that statement on the basis of the court's earlier ruling that the defendant had no legal standing to object to the entry into the apartment. The court also explained to the jury that, although Conti had testified during her deposition that she did not voluntarily let the police enter, the legality of their entry into the apartment was immaterial as far as the defendant was concerned. The court also, sua sponte, ruled immaterial her deposition testimony that the police told her to wake him up, that she then went into the bedroom but could not do so, that she then returned to the back door, and that they then "forced their way in there, and Jack was on the bed. And they just peeled Jack literally off the bed and dragged him out into the hallway."

Although this testimony was excluded from consideration by the jury, it is inextricably bound to that claim and to the evidence that was before the jury, and relates directly to the issue of the legality of the police entry into the bedroom.

*nan,* supra, 24 Conn. App. 482. Neither the facts of this case nor the claims of the defendant require a determination of whether a person has a privilege to resist unlawful police entry into any place where he has a protected fourth amendment expectation of privacy regardless of the degree of that expectation. We leave that issue to a case that properly presents it.

We do not decide, furthermore, that the defendant had the privilege to resist the arrest, rather than the entry. Although there is some language in his request to charge and in his brief in this court that suggests such a claim, the gist of his position in this court is that he was entitled to a jury instruction regarding his privilege to resist the unlawful entry of the police into the bedroom. We do not understand his claim to be that he was entitled to use force to resist his arrest, and he conceded as much at oral argument in this court. General Statutes § 53a-23, which prohibits the use of physical force to resist an illegal arrest, does not foreclose the defendant from claiming a privilege to resist an illegal entry.

Finally, we do not decide whether the defendant had a common law privilege—uninformed by the core value protected by the fourth amendment, namely, the expectation of privacy in the home—to resist an illegal entry into the bedroom he was occupying in the home in which he was an overnight guest. Although it is not entirely clear whether an overnight guest in the house of another has such a common law privilege,[16] we are

[16] See, e.g., 1 Z. Swift, Digest of the Laws of the State of Connecticut p. 592 (homeowner's right to resist unlawful entry extends to permanent boarders and those who have made a house their home, but not to "a stranger, or a visitor"); 1 F. Wharton, *Criminal Law and Procedure* (Anderson Ed. 1957) § 353 (person in possession of property, as owner or agent thereof, privileged to resist entry); 1 W. LaFave & A. Scott, Substantive Criminal Law § 5.9 (e) (one in lawful possession of property may take reasonable steps to prevent unlawful entry); see also 2 P. Robinson, Criminal Law Defenses § 131 (e) (2) (many modern defense of property and habitation stat-

not persuaded that, as the state argues, the scope of the common law privilege should in all circumstances define the privilege to resist an entry, or that it should do so under the facts of this case.

What we do decide is that, for the reasons that follow, if, in the present case, the trier determines that the defendant was an overnight guest in the bedroom of another's home, that the police made an unlawful nighttime entry into that bedroom, and that the defendant's host was in the house and did not consent to that entry, his status was so comparable to that of his host that he had a privilege to resist such an illegal entry analogous to that of a householder. Thus, the defendant was entitled to an appropriate jury instruction that he had a "privilege to offer reasonable resistance, not rising to the level of an assault, to an unlawful entry"; *State* v. *Gallagher,* supra, 443; into the bedroom, and that such a privilege was a defense to prosecution for interfering with a police officer.

In *Gallagher,* we reversed the conviction of a householder for interfering with an officer, where that conviction arose out of resistance to the warrantless entry of the police into the defendant's home. Under the defendant's version of the facts, the entry was gained by deception. Id., 445. We held that the common law privilege to resist an unlawful warrantless entry by the police into one's home remains a defense to the misdemeanor of interfering with a police officer. Id., 442.

Animating that decision were two fundamental factors. The first was the recognition that the " 'physical entry of the home is the chief evil against which the

utes allow person to defend another's property). Despite the state's argument to the contrary, it is not clear to us whether, under these authorities, an overnight guest would be considered, on the one hand, a member of the household or a person in lawful possession of the property, or, on the other hand, a stranger or visitor.

wording of the Fourth Amendment is directed' ''; id., 443, quoting *Payton* v. *New York,* 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); and, thus, the further recognition of "the continuing vitality of that expectation of privacy in the home which underlies the common law right . . . ." *State* v. *Gallagher,* supra. The second factor was the recognition that, although the policy arguments against resistance to an unlawful arrest "apply in some measure to resistance to an unlawful entry"; id., 442; nonetheless, General Statutes § 53a-23 did not "abrogate the privilege to resist an unlawful entry." Id., 441. We, therefore, continued to adhere "to the common law view that there are circumstances where unlawful warrantless intrusion into the home creates a privilege to resist, and that punishment of such resistance is therefore improper." Id., 442. We held that the defendant was entitled to have the jury instructed on his "common law privilege to offer reasonable resistance, not rising to the level of an assault, to an unlawful entry." Id., 443.

In *Gallagher,* we drew a distinction between resistance to the entry and resistance to the arrest. We left it to the jury on the retrial to determine whether the defendant's conduct was directed at the entry or the arrest. Id., 445. This was so despite the fact that, "[u]nder the defendant's version of the facts . . . it was the attempt to arrest which triggered the belated recognition of the police officer's true purpose in obtaining entry." Id.

Thus, in *Gallagher* we recognized that the core value of the fourth amendment required that a householder's common law right to resist an unlawful entry into his home afforded him a defense to the charge of interfering with an officer, where the alleged interference took the form of nonassaultive resistance to the entry. The question posed by the facts of this case is whether the same core value of the expectation of privacy in

the home requires the same result with respect to an overnight guest of the householder. We are persuaded that it does, because of the nature of that core value and because of the nature of an overnight guest's expectation of privacy afforded by the fourth amendment.

In *Payton* v. *New York,* supra, the United States Supreme Court reaffirmed the overarching significance, under the fourth amendment, of the sanctity of the home. The court found the following reasoning of the Second Circuit Court of Appeals "to be persuasive and in accord with [the] Court's Fourth Amendment decisions": " 'To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.' " Id., 588–89, quoting *United States* v. *Reed,* 572 F.2d 412, 423 (2d Cir.), cert. denied sub nom. *Goldsmith* v. *United States,* 439 U.S. 913, 99 S. Ct. 283, 58 L. Ed. 2d 259 (1978). The court stated further: "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman* v. *United States,* 365 U.S. 505, 511 [81 S. Ct. 679, 5 L. Ed. 2d 734 (1961)]." *Payton* v. *New York,* supra, 589–90. "The right of officers to thrust themselves into a home is . . . a grave concern, not

only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance." *Johnson* v. *United States,* 333 U.S. 10, 14, 68 S. Ct. 367, 92 L. Ed. 436 (1948).

In *Minnesota* v. *Olson,* 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990), the United States Supreme Court concluded that an overnight guest in another's home has a legitimate expectation of privacy under the fourth amendment, and elaborated on the nature of that expectation. "To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

"From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth—'a temporarily private place whose momentary occupants' expectations of freedom from intrusion are

recognized as reasonable,' *Katz* [v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)] (Harlan, J., concurring).

"That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household. If the untrammeled power to admit and exclude were essential to Fourth Amendment protection, an adult daughter temporarily living in the home of her parents would have no legitimate expectation of privacy because her right to admit or exclude would be subject to her parents' veto." *Minnesota* v. *Olson,* supra, 98–100.

Several aspects of this expectation of privacy lead us to conclude that an overnight guest's expectation of privacy in the bedroom he occupies should be regarded as affording him the functional equivalent of the householder's common law privilege to resist an unlawful police entry. The first is the deep-rooted

universality of that expectation. "We will all be hosts and we will all be [overnight] guests many times in our lives." Id., 98. Furthermore, the ordinary reasons that we become overnight guests are equally deep-rooted in our normal expectations that we will be treated, for purposes of protection from invasion, essentially as householders. "We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend." Id., 99. Finally, the overnight guest is to a large degree the shareholder of his host's privacy. "The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest." Id. We see no principled reason why the overnight guest should not also share his host's privilege to resist an unlawful entry into the bedroom that the guest occupies with his host's permission.

The state argues, nonetheless, that in this case the defendant was not resisting the entry, but that he was resisting the arrest, which under *Gallagher* he had no right to resist. While that is one inference that the jury could have drawn from the evidence, it was not the only inference. The fact that the defendant might not have been aware of the entry into the bedroom and that he did not offer any resistance to the officers until after they were already in the bedroom and had awakened him and had pulled him from the bed,[17] does not mean that his resistance must necessarily be regarded as directed to the arrest rather than to the entry. There was evidence that the arrest took place, not in the bed-

---

[17] We point out, however, that under Morton's version of the facts, namely, that the defendant was feigning sleep, he would have been aware of the entry when it was effected.

room, but in the hallway after the defendant was removed from the bedroom. Furthermore, just as in *Gallagher,* where the defendant was entitled to have the jury determine whether his resistance had been to the arrest or to the deceptive entry that preceded it, in this case, the defendant was entitled to have the jury determine whether his resistance was to the arrest or to the forceful entry that preceded it.

The state also argues that considerations of public policy[18] counsel against extending the householder's privilege of resistance to those persons who are entitled to invoke the exclusionary rule under the fourth amendment. We disagree.

Without denigrating the force of those policy considerations, we conclude nonetheless that they do not override the close relationship, bottomed on fourth amendment concerns, between the householder's expectations of privacy and those of his overnight guest, at least as evidenced by the facts of this case. Furthermore, in other contexts the fourth amendment affords an individual a defense to charges of unlawful failure to comply with an official entry, notwithstanding the inapplicability of the exclusionary rule to the facts of the case. See, e.g., *Marshall* v. *Barlow's, Inc.,* 436 U.S. 307, 98 S. Ct. 1816, 56 L. Ed. 2d 305 (1978) (fourth amendment bars enforcement of federal statute compelling manager to submit to warrantless inspection of business involved in interstate commerce); *See* v. *Seattle,* 387 U.S. 541, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967) (where defendant refused to permit fire

[18] These considerations, the state urges, are: it is better policy to require the citizen to challenge the unlawful entry in court rather than permit him to do so at the place of entry; increasing the class of persons to whom the common law privilege applies increases the risk of escalation of violence resulting from encounters between police and citizens; and other remedies, such as the exclusionary rule, are now available to the citizen whose privacy was invaded, and therefore it is not necessary or wise to add to those remedies by extending the privilege.

inspector to enter warehouse without permit, defendant could not be prosecuted for exercising fourth amendment right to insist on warrant authorizing entry); *Camara* v. *Municipal Court,* 387 U.S. 523, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967) (fourth amendment bars prosecution of tenant for refusing to allow warrantless entry into apartment building authorized by fire code). "Although it is frequently invoked in criminal trials, the Fourth Amendment is not a trial right; the protection it affords against governmental intrusion into one's home and affairs pertains to all citizens." *Kimmelman* v. *Morrison,* 477 U.S. 365, 374, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986).

## II

We next consider the state's challenge to the remand by the Appellate Court for further proceedings regarding the convictions of the defendant of interfering with an officer and criminal mischief in the Groton police department booking room. The state claims that the Appellate Court improperly employed plain error review in ordering this remand because, contrary to the determination by the Appellate Court, the defendant was not precluded from attempting to establish that the erasure of the videotape had been in bad faith.[19] We need not determine, however, whether plain error review was appropriately employed because we conclude that even upon plenary review the defendant is not entitled to a remand for further proceedings concerning these convictions.

We endorse the analysis of the Appellate Court that the erasure of the videotape involves, not the suppres-

---

[19] The state also argues that it is merely speculative in this case whether the videotape would have disclosed exculpatory material, because there is nothing in this record showing where the camera was pointed and whether the defendant was within its scope. We need not consider this argument because of our conclusion that the defendant was not deprived of an opportunity to establish a bad faith erasure of the tape.

sion of exculpatory evidence under *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny, but "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona* v. *Youngblood,* 488 U.S. 51, 57, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). Thus, this inquiry focuses on "the contours of the state's duty, under the federal constitution,[20] to preserve *potentially* exculpatory evidence." (Emphasis added.) *State* v. *Leroux,* 18 Conn. App. 223, 226, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072 (1989).

Under *Youngblood,* "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona* v. *Youngblood,* supra, 58. "Bad faith" in this context, moreover, "turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id., 57. Thus, in order to prevail on such a claim, a defendant must establish that the police knew that the evidence was exculpatory when they lost or destroyed it.[21] *State* v. *Leroux,* supra, 228. Application of these principles to the record in this case leads us to conclude that the defendant was not precluded from making the requisite showing of bad faith.

[20] Neither the Appellate Court, nor the defendant in this court, relied on an analysis of the state constitution. We, therefore, confine our analysis to federal constitutional standards. *State* v. *Lewis,* 220 Conn. 602, 608 n.3, 600 A.2d 1330 (1991).

[21] The "reasons for a difference in treatment between suppressed and lost or destroyed evidence are (1) to avoid the treacherous task of determining the import of unknown, often disputed materials, (2) the unwillingness to impose on the police an absolute duty to preserve all material that might be of conceivable evidentiary value in a particular prosecution, and (3) a belief that requiring a showing of bad faith 'both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly

Pendleton testified that the booking room was approximately ten feet square, and that as one entered there was, on the left, a video camera with a chair behind it, a metal desk with another chair, and a row of lockers. On the right, as one entered there was a sink, a row of lockers, and a chair for the police officer to use during the booking process. Pendleton also testified that when the defendant was brought into the booking room "he started kicking. It was basically towards the inside and to the left . . . ." Pendleton testified further that the defendant, after kicking one of the chairs, had also kicked a small metal box that housed the computer terminal, breaking a key to the terminal.

On cross-examination, Pendleton also testified that the video camera ran whenever a prisoner was brought in, that it had been running when the defendant was there, and that the tape had not been preserved. When the defendant inquired whether Pendleton knew why the tape had not been preserved, the state objected without giving a ground for the objection, the court sustained the objection, and the defendant excepted without stating the basis for his claim.

At the beginning of the next day's testimony, however, the defendant reopened the subject of the destruction of the tape. He asked the trial court if he could inquire in the jury's absence about "the surveillance tapes and the booking room," and the court responded affirmatively. The defendant then asked Pendleton whether he knew when the tape had been "destroyed or erased," and Pendleton responded that he did not

require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.' " *State* v. *Leroux,* 18 Conn. App. 223, 227, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072 (1989), quoting *Arizona* v. *Youngblood,* 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S. Ct. 885, 102 L. Ed. 2d 1007 (1989).

know. The defendant then asked Pendleton whether he knew "what the procedure is for the erasure of those tapes?" Pendleton responded that "[t]hey just reuse them." The defendant asked, "Is it on a 24-hour basis or on a 30-day basis; do you have knowledge of that?" and Pendleton replied that he did not. The defendant then responded, "Okay. You ready now?" and the jury was returned to the courtroom.

Unlike the Appellate Court, we do not read this record to establish that the court denied the defendant an opportunity to establish that the police had erased the videotape in bad faith.[22] Although arguably the court should not have sustained the state's objection to the defendant's question regarding whether Pendleton knew why the tape had been erased; but see Practice Book § 288 (upon objection to admission of evidence "counsel shall state the grounds upon which it is claimed or upon which objection is made"); any prejudice from that ruling was cured by the defendant's unfettered inquiry the next day in the absence of the jury. There is no suggestion in the transcript of undue limits having been placed on the defendant's inquiry. He was permitted to ask whether Pendleton knew the procedure for erasure, and the information elicited was, if anything, supportive of an inference of routine erasure and thus contrary to any suggestion of bad faith on the part of the police.

[22] The defendant argues that he was entitled to a copy of the videotape because the tape was discoverable as of right as his "statement" within the meaning of Practice Book §§ 749 and 750, since he had filed a pretrial discovery motion requesting copies of any such statements, to which the state had responded, "None known at this time," and since Pendleton had testified that the defendant was "vocal" in the booking room. Pendleton's testimony was that the defendant was vocal in giving his opinion of the police. The defendant also argues that the tape was a "statement" of Pendleton because it "contained verbal and nonverbal statements" of Pendleton. We decline to address these arguments, which were not made in the trial court, because they are not fairly within the issues certified.

The defendant had the burden to establish that the erasure of the tape was in bad faith. He did not, although he was afforded a fair opportunity to do so.

With respect to the first count, the judgment of the Appellate Court is affirmed; with respect to the second and fifth counts, the judgment of the Appellate Court is reversed, and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion PETERS, C. J., CALLAHAN, GLASS, COVELLO and BERDON, Js., concurred.

SHEA, J., dissenting. I disagree only with the majority's affirmation of the Appellate Court in reversing the defendant's conviction under the first count of the information for interfering with an officer in violation of General Statutes § 53a-167a. I continue to adhere to my views, expressed in State v. Gallagher, 191 Conn. 433, 445–47, 465 A.2d 323 (1983) (Shea, J., concurring), that the abolition of the common law privilege to resist an illegal arrest effectuated by General Statutes § 53a-23 should also be deemed to have terminated the intertwined privilege to use reasonable physical force to resist an unlawful entry by the police: "Where violence may be involved, modern society prefers the courtroom to the street or the home as the arena for determination of the legality of police conduct. We should, therefore, discourage violent conduct in the household as well as in public places which may expose to serious injury peace officers as well as those they seek to arrest. In sanctioning the use of a vaguely defined 'reasonable force' to protect home and hearth, the majority opinion appears to make the defense of the illegality of police conduct available for many violent crimes which may be perpetrated upon an officer whose judgment is later found to be erroneous." Id., 447.

When the police enter a home in order to arrest the owner or another person entitled to assert the same rights, as in this case, it is impossible to draw any practical distinction between the use of reasonable force to resist the illegal entry and that employed to resist the illegal arrest. By declaring that there is a privilege, when the arrest is preceded by an illegal entry into a home, to use force to repel the unlawful invader but not to prevent the arrest, we pose a conundrum likely to generate extensive confusion among the police, the courts and the public in determining whether the use of reasonable force is permissible.

In this case, for example, when the police attempted to pull the defendant from the bed on which he was lying, he attempted to break free, and a struggle ensued that formed the basis for his conviction in the first count of interfering with an officer in violation of § 53a-167a, despite the fact that the illegal entry had been completed at the time the police awoke the defendant and the struggle commenced. The majority apparently holds that the defendant's disruptive conduct was privileged if he was struggling solely for the purpose of ejecting the police rather than for the purpose of resisting the arrest. It is conceivable that the same conduct may have dual motivation. Does the privilege exist if the primary motivation is to resist the arrest but a secondary motive is to resist an illegal entry? This and other problems in the practical application of the privilege to resist illegal entry persuade me that this court should not persist in attempting to preserve a common law right to resist illegal entry so difficult to distinguish in the real world from the privilege of resisting an unlawful arrest, which § 53a-23 has abolished.

The comment of the draftsmen of § 53a-23 indicates that its purpose was to change the common law rule concerning the right to resist an illegal arrest. Commission to Revise the Criminal Statutes, Penal Code

Comments, Connecticut General Statutes Annotated (1971) § 53a-23. The reasons for the change, however, are equally applicable to the use of force to resist an illegal entry for the purpose of effectuating an arrest: "The rationale for this change is that the question of whether an arrest is legal or illegal . . . is usually a very difficult factual question; that the prior rule invites violence; and that it is better social policy to require the arrestee to submit and challenge the arrest in court, rather than to permit him to use force at the place of arrest subject to a later judicial determination of the legality of the arrest." Id. Violence at the threshold of a dwelling entails the same risks as violence on the streets.

There is an imbalance, nevertheless, in a rule of law that punishes a person for conduct that has been precipitated by unlawful action of the police in violation of his constitutional rights. In State v. Gallagher, supra, 446, I concurred in the result reached by the majority by expressing my adherence to the decision of this court in State v. Cesero, 146 Conn. 375, 379, 151 A.2d 338 (1959), in which we had adopted the view that a police officer was not acting in the performance of his duties when executing an invalid search warrant and, therefore, the state had failed to establish an essential element of the crime of interfering with an officer.[1] See also State v. Anonymous (1977–5), 34 Conn. Sup. 531, 545–47, 375 A.2d 417 (1977). I now abandon that position and adopt the view of the Appellate Court

[1] The statute involved in State v. Cesero, 146 Conn. 375, 151 A.2d 338 (1959), provided: "RESISTING OFFICER. Any person who shall obstruct, resist or abuse any officer concerned in the administration of justice while in the execution of his office shall be fined not more than one hundred dollars or imprisoned not more than three months or both." (Emphasis added.) General Statutes (1958 Rev.) § 53-165. The penal code, adopted in 1971, substituted for the italicized phrase the language "any peace officer or fireman in the performance of his duties" and also made other revisions. Public Acts 1971, No. 871, § 50; see also Public Acts 1976, No. 76-225.

in *State* v. *Privitera,* 1 Conn. App. 709, 722–23, 476 A.2d 605 (1984), that an officer continues to act in the performance of his duty "[i]f he is acting under a good faith belief that he is carrying out that duty, and if his actions are reasonably designed to that end." Id., 722. I am persuaded that the risk of injury to the public or the officer from the use of force in the setting of an arrest in a home is simply too great to encourage resistance even when the police are acting illegally. The arrestee or householder can rarely prevail in such a confrontation and is better left to his civil remedies for violation of his constitutional rights. See 42 U.S.C. § 1983. Trespasses on civil rights that may be redressed in court are preferable to the bashed craniums likely to result from the assertion of those rights by the use of physical force.

Since I disagree with the majority on whether the right to use physical force to resist an illegal entry should be preserved, I would reverse the Appellate Court's contrary conclusion and remand the case with direction to reinstate the defendant's conviction for interfering with an officer in the first count of the information. With respect to the remaining convictions of the defendant for interfering with an officer at the Groton police station and for criminal mischief in the third degree, I agree with the majority's reversal of the Appellate Court and the reinstatement of those convictions.