STATE OF CONNECTICUT *v.* RAYMOND CERILLI
(14338)

PETERS, C. J., SHEA, COVELLO, BORDEN and BERDON, Js.

Argued January 8—decision released June 4, 1992

*Sue L. Wise,* for the appellant (defendant).

*Leon F. Dalbec, Jr.,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *David Gold,* assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant, Raymond Cerilli, appeals[1] from the judgments of conviction, after a jury trial, of the crimes of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), sexual assault in the first degree in violation of General Statutes § 53a-70, attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70 and 53a-49 (a) (2), risk of injury to a child in violation of General Statutes § 53-21, and failure to appear in the first degree in violation of General Statutes § 53a-172.[2] The defendant claims that: (1) the trial court

---

[1] The defendant originally filed the appeal in the Appellate Court, although it should have been filed in this court pursuant to General Statutes § 51-199 (b) (3). The chief clerk of the Appellate Court transferred the case to this court pursuant to Practice Book § 2003.

[2] General Statutes § 53a-92 (a) (2) (A) provides: "KIDNAPPING IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually."

General Statutes (Rev. to 1987) § 53a-70 provides: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person.

"(b) Sexual assault in the first degree is a class B felony for which one year of the sentence imposed may not be suspended or reduced by the court."

General Statutes § 53a-49 (a) (2) provides: "CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

denied him due process of law by refusing to instruct the jury regarding the issue of identification; (2) the conduct of the New Haven police department resulted in the denial of his rights to confront witnesses, to the effective assistance of counsel and to due process of law by destroying or failing to produce crucial evidence; and (3) the trial court denied him due process of law by erroneously instructing the jury regarding the offense of failure to appear. We conclude that there was no reversible error, and we affirm the judgment.

The jury could reasonably have found the following facts. In October, 1987, the defendant lived in an apartment in Hamden, with his fiancee, Theresa Zumbo, and her daughter. On October 23, 1987, at approximately 9 p.m., the defendant and Zumbo, whose daughter was staying that evening with Zumbo's mother, picked up a friend, Etta Goldberg, at her residence in the Westville section of New Haven, and drove in the defendant's car to "Sally's," a bar in New Haven. The

General Statutes § 53-21 provides: "INJURY OR RISK OF INJURY TO, OR IMPAIRING MORALS OF, CHILDREN. Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

General Statutes § 53a-172 provides: "FAILURE TO APPEAR IN THE FIRST DEGREE: CLASS D FELONY. (a) Any person who, while charged with the commission of a felony and while out on bail or released under other procedure of law, wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear, is guilty of failure to appear in the first degree.

"(b) Failure to appear in the first degree is a class D felony."

The first four convictions arose from a five count information, pursuant to which the defendant was acquitted of the charge of assault in the second degree in violation of General Statutes § 53a-60 (a) (1). The fifth conviction arose pursuant to a separate information. The two informations were consolidated for trial. The trial court, therefore, rendered two separate judgments.

defendant's car was a 1982 Malibu Classic, burgundy in color, with an automatic transmission, four doors and bench seats. There was a broken "piece" on the inside of the front passenger side door. The car was missing a glove compartment, and there were wires protruding from the glove compartment area.

The defendant, Zumbo and Goldberg stayed at the bar until approximately 2 a.m. Before they left, however, the defendant and Zumbo got into an argument that continued until they arrived at Goldberg's residence. Zumbo and Goldberg entered Goldberg's house and the defendant left. At approximately 2:30 a.m., Goldberg drove Zumbo to Zumbo's mother's house, where Zumbo spent the rest of the night. At some time before 3:15 a.m., the defendant returned to Goldberg's house looking for Zumbo. Goldberg told him that she was at her mother's house but refused to let him use the telephone to call Zumbo. At approximately 3:15 a.m., the defendant called Zumbo at her mother's house from another telephone, but Zumbo refused to talk with him.

Meanwhile, N. W., the fourteen year old victim, and her friend, Raquel Reeves, were in the Westville section of New Haven, having visited friends. At approximately 3 a.m., they were walking toward downtown New Haven. As they reached Whalley Avenue, the defendant drove up to them and asked them if they wanted a ride. They accepted, and sat in the front seat of the defendant's car. The victim sat next to the defendant and Reeves sat next to the door.

After starting to drive toward downtown, the defendant told the two girls that, because his car was not registered, he would have to drive on back roads so as not to be seen by the police. Thereafter, he stopped the car and told the girls to leave the car because he was going to take the highway. As Reeves left the car, the defend-

ant put his arm around the victim's neck, preventing her from leaving the car, and drove away onto a highway at a high rate of speed. When the victim began to scream, the defendant told her to stop or he would cut off her head. Reeves went to a nearby hospital and contacted the police.

During the drive, the victim was crying and asked the defendant why he was doing this to her. He told her that this would teach her not to be out so late, and that this would be a lesson to her. He also put his hand inside her shirt and touched her chest, and would not stop doing so when she told him to stop. She asked him to stop the car and let her out, but he refused.

After leaving the highway, the defendant, who was wearing a New York Giants sweatshirt, took another New York Giants sweatshirt from inside the car, wrapped it around the victim's head and pushed her down in the seat. He continued to drive, and eventually parked the car on a hill. The defendant led the victim, the sweatshirt still wrapped around her head, out of the car, over a gravel surface, up some wooden steps, through two doors that the defendant opened with keys, and into a room where the defendant removed the sweatshirt from the victim's head.

The victim was in a living room with wall-to-wall carpeting. The defendant brought her through a kitchen, which contained a double-door refrigerator, into a hallway that opened onto a bedroom on each side and a bathroom at the end. The defendant took her into one of the bedrooms. That room contained a waterbed with a wooden headboard, a dresser arranged kitty-cornered, two closets—one with sliding doors, containing women's clothes—and a plaque on the wall that looked like it came from a bar. The lights were on.

The defendant ordered the victim to take off all of her clothes. She complied because she feared for her

life. The defendant removed his clothes, put a blanket on the bed and turned off the lights. He made the victim lie down on the bed. He tried to put his penis into the victim's mouth but she refused. He then penetrated her vagina with his penis, but he could not maintain an erection. The defendant then began to insert his fingers into the victim's vagina. He took some cream from the headboard, put the cream on his hands, inserted all his fingers into her vagina, and made a fist and pushed it into her vagina. When the victim began to scream, the defendant put a pillow over her head and told her to "shut up." The victim heard a tearing sound in her vagina and felt herself begin to bleed.

When the defendant saw the blood, he told the victim to get dressed. The defendant then put the sweatshirt back over the victim's head and led her back to the car. After driving for approximately ten minutes, he stopped the car, pushed the victim out and drove away. The victim removed the sweatshirt and left it on the street, where it was later retrieved by the New Haven police.

The victim walked to a gas station, where the police were called. The victim was taken by ambulance to the hospital, where she underwent surgery for a laceration of the vagina that extended the full length of the vaginal canal. This injury was consistent with a fist having been made inside the vagina.

At approximately 6:30 a.m., the defendant called Zumbo and they reconciled. After he picked her up at her mother's house, they returned to their apartment. Zumbo noticed that the quilt was off the bed. The defendant said that he had spilled tea on it, that he had washed it and that it was in the dryer. The defendant had never washed the bedding or quilt before because that was ordinarily Zumbo's responsibility. Zumbo checked the dryer and found the quilt in it.

On November 2, 1987, after the victim had been released from the hospital, in the company of the police she identified the defendant's car. She also positively identified the defendant from a twelve person photographic array as the person who had kidnapped and assaulted her. On the same day, Reeves also identified the defendant's car and photograph.

The defendant was arrested later that day and brought to the New Haven police department where, after waiving his *Miranda* rights,[3] he denied any involvement with the victim. He admitted owning the car identified by the victim and Reeves, however, and told the police that only he and Zumbo had access to it. He also told the police that he had been with Zumbo in their apartment from 7 p.m. on October 23, 1987, until the next morning.

Later that evening, the New Haven police searched the defendant's apartment, and seized a jar of Vaseline petroleum jelly from the master bedroom and two New York Giants sweatshirts. They also took numerous photographs of the interior of the apartment and the exterior of the building.

## I

The defendant first claims that the trial court denied him due process of law by refusing to instruct the jury specifically on the issue of identification. It is undisputed that the court did not give a specific instruction on identification.[4] Relying on our language in *State v. Tatum*, 219 Conn. 721, 733 n.18, 595 A.2d 322

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] The court recognized this when, in response to the defendant's exception, it stated that "you are right in your assessment—I did not give a separate identification charge because I thought it was abundantly clear to the jury that it was this defendant that they would have to identify [as] being the perpetrator of the crime."

(1991),[5] the defendant argues that, although neither the victim nor Reeves was uncertain of her identification of the defendant, their testimony regarding that identification and the defendant's car was so confused and inconsistent[6] that, "given the defense reliance on the

[5] In *State* v. *Tatum,* 219 Conn. 721, 733 n.18, 595 A.2d 322 (1991), where the trial court had given a special instruction on identification, we stated in dictum "that a trial court's refusal to give *any* special instruction whatsoever on the dangers inherent in eyewitness identification constitutes reversible error where 'the conviction of the defendant [turns] upon the testimony of eyewitnesses who were uncertain, unclear or inconsistent'; *State* v. *Harden,* 175 Conn. 315, 322, 398 A.2d 1169 (1978); *State* v. *Davis,* 198 Conn. 680, 504 A.2d 1372 (1986) . . . ." (Emphasis in original.)

[6] The defendant relies on the following claimed uncertainties and inconsistencies in the victim's and Reeves' testimony. In a forty-two page typewritten statement given to the police on October 26, 1987, the victim described her assailant as a white man between 5'10" and 6' tall, a little flabby or pouchy, thirty-five to forty years old or older. She described his skin as having "little holes and cratering in his face," and she stated that the blemishes on his face "looked like somebody had acne." In response to the question by the police whether it was "[h]eavy acne or just light acne?" she responded, "Yeah, and they was red." In response to the question, "Red in complexion?" she responded, "Mm hmm, real pale." In this statement, the victim described the assailant's hair as "long, dark . . . brown . . . feathered up . . . and it came down to about his shoulders [blank space] neck and he had it curled . . . ." She also described it as "real dark brown, almost . . . black" with "light brown, brown/blond . . . streaks . . . mixed in . . . ." She described his nose as "funny shape[d]," "real round . . . skinny and . . . round, real curved . . . pointed at the end . . . ." She noticed no scars or anything else unusual about him. She described his car as dark brown, square, with a light tan interior, and with nothing unusual about the rearview mirror.

At the trial, the victim described the assailant as having, inter alia, acne and a pockmarked face, and a prominent, hawk-like nose. She also recalled describing the assailant's car as dark brown with a tan interior and a vinyl roof.

On the night of the incident, Reeves had given the police a statement describing the assailant as having light brown or blond curly hair that reached down to about his neckline and was combed back. She described his face as having "little holes" in it that looked "like craters," and his nose as "funny shaped." She stated that he had been wearing a red shirt or sweater.

The next day, Reeves gave the police another statement in which she described the man as having blond, collar length hair. She also described him as wearing a sweatshirt with red on it.

theory of misidentification, it was reversible error for the trial court to refuse to instruct the jury specifically that the State bore the burden of proving identification beyond a reasonable doubt." The defendant further contends that "it was incumbent upon the trial court to give the cautionary identification instruction requested by the defense,"[7] and since that instruction

At a pretrial proceeding, Reeves had described the assailant as having curly, combed back hair that did not rest on his shoulders and that was either light brown or dark brown. She also had described him as having acne and "like holes in his face," and as having a "funny-shaped nose."

At trial, Reeves reaffirmed that she had described the assailant as she had done in her statements and her pretrial testimony. She also stated that his hair was light blond or light brown, and shoulder length, and that the car had a dark or black exterior and a beige or light colored interior.

The defendant claims that, contrary to these descriptions by the victim and Reeves, the record at the trial established that in October, 1987, the defendant "had black hair which he did not wear shoulder length or swept away from his face, feathered at the sides; he did not have acne or a pock-marked face; he did not have brown or blond streaked hair; he was not six feet tall, but . . . was only 5'7" and weighed 185 pounds . . . [and] he did not have a funny shaped nose." The trial record supports most, but not all, of this claim of the defendant. The photographs of the defendant indicate that his hair was not feathered, or light brown or streaked, and that it was dark in color. Although there is no profile photograph, his nose does not appear to be unusually prominent or hawk-like, and we can assume that the jury was able to discern that discrepancy. His hair, however, does appear to be curly and to reach at least to below his neckline, and Zumbo testified that at the time of the offense the defendant's hair had been "long in the back," and reaching to his shoulders. There was also testimony that he was 5'7" and weighed 185 pounds, and that he had no acne or holes in his skin.

Furthermore, Zumbo testified that, because of an accident, the defendant had difficulty controlling the right side of his face, he could not move his right eyebrow, and the shape of his mouth and how he spoke had been affected by the accident. Also, the photograph discloses that on each arm he had two large tattoos, one on each upper arm and each forearm. Neither the victim nor Reeves had mentioned these characteristics in her earlier descriptions or testimony. The trial evidence also established, as the defendant claims, that his car had a maroon exterior, no vinyl roof, a burgundy velour interior, and an unusually large rearview mirror with five separate compartments.

[7] The defendant filed the following request to charge: "One of the most important issues in this case is the identification of Raymond Cerilli as the

was not given, the "defendant was denied due process of law by the failure of the court to instruct on identification . . . ." We disagree.

perpetrator of the crime. The government has the burden of proving identity, beyond a reasonable doubt. It is not essential that the witnesses be free from doubt as to the correctness of her statement. Rather, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

"Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

"In appraising the identification testimony of a witness, you should consider the following:

"1. Are you convinced that the witnesses had the capacity and an adequate opportunity to observe the offender?

"Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were lighting conditions, whether the witness had had occasion to see or know the person in the past.

"2. Are you satisfied that the identification made by the witnesses, subsequent to the offense was the product of her own recollection? You may take into account both the strength of the identification, and the circumstances under which the identification was made.

"If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to them for identification, you should scrutinize the identification with great care. You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witnesses to see the defendant, as a factor bearing on the reliability of the identification.

"[3]. Finally, you must consider the credibility of each identification witness in the same way as any other witness, consider whether they are truthful, and consider whether they had the capacity and opportunity to make a reliable observation on the matter covered in the testimony.

"I again emphasize that the burden of proof on the prosecution extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identification of Raymond Cerilli as the perpetrator of the crime with which he stands charged. If, after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty. *United States* v. *Telfaire,* 469 F.2d 552 (D.C. Cir. 1972); see *State* v. *Benjamin,* 33 Conn. Sup. 586 [363 A.2d 762] (1976)."

Neither *State* v. *Tatum,* supra, nor any of the other cases upon which the defendant relies; see *United States* v. *Telfaire,* 469 F.2d 552 (D.C. Cir. 1972); *State* v. *Pollitt,* 205 Conn. 132, 531 A.2d 125 (1987); *State* v. *Davis,* 198 Conn. 680, 504 A.2d 1372 (1986); *State* v. *McKnight,* 191 Conn. 564, 469 A.2d 397 (1983); supports the defendant's argument that an identification instruction is constitutionally required. Indeed, we have recently held that "[e]ven if [a] court's instructions were less informative on the risks of misidentification than they might have been, the issue is at most one of instructional error rather than of constitutional error. A new trial would only be warranted, therefore, if the defendant could establish that it was reasonably probable that the jury was misled." *State* v. *Tillman,* 220 Conn. 487, 501, 600 A.2d 738 (1991); see also *State* v. *Anderson,* 20 Conn. App. 271, 281, 566 A.2d 436 (1989), cert. denied, 213 Conn. 813, 569 A.2d 549 (1990) (no constitutional right to instruction on fallibility of eyewitness identification).

We agree with the defendant that a specific instruction on identification was warranted because his theory of defense was misidentification and because there were sufficient instances of lack of clarity and sufficient inconsistencies in the identification testimony of the victim and Reeves. See footnote 6, supra. We conclude, however, that any such instructional lacuna did not constitute reversible error. This is not a case where the conviction turned on the "uncertain, unclear or inconsistent" eyewitness identification of the defendant by the victim and Reeves. (Internal quotation marks omitted.) *State* v. *Tatum,* supra, 733 n.18. There were sufficient certainties and consistencies in the testimony of the victim and Reeves, sufficient evidence corroborating that testimony and strong evidence of consciousness of guilt so that there was no reasonable probability that the jury was misled.

First, shortly after the crimes, both the victim and Reeves selected the defendant's photograph from among an array of twelve photographs. Both these identifications were positive, and the defendant has not challenged the fairness of that procedure. Moreover, they both positively identified the defendant at trial.

Second, despite the inconsistencies in the victim's and Reeves' descriptions of the assailant, there were also elements of consistency with the defendant's appearance. They both described the defendant as a stocky white male, in his thirties, with curly, shoulder length hair. In one of her pretrial statements to the police, the victim also described the color of the defendant's hair as "real dark brown, almost like a black," his eyebrows as thick and separated rather than running together, and his hands as "like rough for construction workers."[8]

Third, both the victim and Reeves positively identified the defendant's car. Reeves accurately described the broken piece on the interior of the front passenger side door, and they both accurately described the missing glove compartment and exposed wires.

Fourth, the victim accurately described both the exterior and the interior of the defendant's apartment. She described the apartment as being on a hill, with a gravel approach and several wooden steps leading to the front entrance, which consisted of two separate doors that had to be opened. She described the layout of the interior: a living room with wall-to-wall carpeting, leading to a kitchen with a double-door refrigerator; then a hallway off of which were two bedrooms and at the end of which was the bathroom. She also described the bedroom in which the assault took place as containing a waterbed, two closets—one of which contained

---

[8] Zumbo testified that the defendant had been doing carpentry work while they were dating and while they were engaged.

women's clothes—a dresser kitty-cornered, and a plaque on the wall that looked like it came from a bar. All of these descriptions were consistent with the photographs[9] taken by the police and with Zumbo's testimony.

The victim's testimony was also corroborated by a jar of Vaseline petroleum jelly and two New York Giants sweatshirts that the police seized from the defendant's apartment. The victim's testimony that she had bled on what she described as the blanket the defendant had put on the bed was corroborated by Zumbo's testimony that, although the defendant had never washed the bedding before, when she arrived home on the morning of the assault she found that he had washed and dried the bed quilt.

Fifth, there was evidence that the defendant was in the Westville section of New Haven, in his car, around the time of the abduction of the victim. He left Goldberg's residence at some time between 3 a.m. and 3:15 a.m., and the abduction took place some time shortly after 3 a.m.

Sixth, there was strong evidence of consciousness of guilt on the defendant's part. The alibi he offered to the police when he was arrested, specifically, that he had been home with Zumbo the entire evening prior to and the morning of the crime, was contradicted by Zumbo's testimony regarding her own whereabouts and those of the defendant and of Goldberg during the time period in question. Further, there was evidence of his flight from the state, his fear of returning to face the charges, his initial refusal to waive extradition, and his escape from jail in New York.

---

[9] One of the photographs taken by the police shows such a framed plaque on the wall, with the legend "Paddock Club." The Paddock Club is a bar and restaurant in East Haven.

Furthermore, it is not reasonably probable that the jury was misled by the court's failure to instruct the jury precisely as the defendant requested because the court complied in part with the defendant's request to charge on the issue of identification. *State* v. *Tillman,* supra. That request; see footnote 7, supra; contained essentially four elements: (1) a focus on the importance of identification as one of the most important issues in the case, and the requirement that the jury be satisfied beyond a reasonable doubt that the defendant was the perpetrator; (2) the capacity and opportunity of the witnesses to observe the perpetrator; (3) whether the identification of the defendant, *subsequent* to the offense, was the product of the witnesses' own recollection; and (4) an assessment of the credibility of the witnesses under general standards governing credibility.

Although the charge did not specifically refer to the first factor, the court did advert to that factor by instructing the jury that it must be satisfied beyond a reasonable doubt that the defendant had committed the crimes charged.[10] With regard to the second factor, the court specifically instructed the jury that, in weighing the credibility of the witnesses, it should consider their "ability to observe objectively, and to remember and

[10] For example, when instructing the jury on the elements of kidnapping, the court stated that the state must prove beyond a reasonable doubt that "the *defendant* abducted the victim; that the *defendant* unlawfully restrained the person he abducted . . . ." (Emphasis added.) When instructing the jury on the elements of sexual assault in the first degree, the court stated that the state must prove beyond a reasonable doubt that "the *defendant* compelled the victim to engage in . . . sexual intercourse either by the use of force or by the threat of the use of force . . . ." (Emphasis added.) The court further stated that "[i]f you find the required sexual intercourse has been proved beyond a reasonable doubt, you must next determine whether the *defendant* used or threatened the use of force." (Emphasis added.) Finally, when instructing the jury on the elements of attempt to commit sexual assault in the first degree, the court stated that "the State must prove beyond a reasonable doubt to sustain a conviction *of this defendant* on this charge . . . that *the defendant* had the specific intent to commit the crime of sexual assault in the first degree." (Emphasis added.)

relate [their] observations here accurately." The court gave no instruction specifically aimed at the third factor, but that omission was perfectly appropriate because the defendant had made no claim that the pretrial identifications of the defendant by the victim and Reeves were tainted. In fact, after filing a challenge to those identifications, the defendant withdrew the challenge because the evidence indicated no suggestiveness in the identification process. Finally, with regard to the credibility of the witnesses, the trial court gave a thorough and accurate instruction on the principles of credibility of witnesses. The court, therefore, complied substantially with two of the four factors suggested in the defendant's request to charge. It adverted as well to one of the remaining factors, and the third remaining factor was not pertinent to the evidence in the case.

In sum, although there were certain inconsistencies and instances of lack of clarity in the victim's and Reeves' identifications of the defendant, there were also significant and reliable certainties in those identifications, significant and reliable corroborating evidence, and significant evidence of the defendant's consciousness of guilt. Furthermore, the court complied in part with the defendant's request to charge on those identifications. Under all these circumstances, it is not reasonably probable that the jury was misled regarding the issue of the identification of the defendant as the perpetrator of the crimes charged.

In place of this analysis, the dissent offers a general exegesis on the dangers of cross-racial eyewitness identification. It is difficult to discern, however, precisely what governing principle the dissent does employ to reach its conclusion of reversible error in this case. Apparently the dissent's argument, offered without supporting authority, is that whenever there is a cross-racial identification and the trial court does not give

a *Telfaire*-type instruction, a new trial is required regardless of the facts of the case. *United States* v. *Telfaire,* 469 F.2d 552 (D.C. Cir. 1972). Nowhere, of course, does the dissent refute—or, indeed, even discuss—the six fact-based factors in this case that, even apart from the trial court's partial compliance with the defendant's request to charge, undercut any reasonable probability that the jury was misled by the trial court's failure to give a specific identification instruction.

## II

The defendant next claims that he was denied his rights to confront and cross-examine witnesses, to the effective assistance of his counsel, and to due process of law because the New Haven police destroyed or failed to produce crucial evidence.[11] The evidence that he claims was destroyed or not produced in violation of his rights consists of the original tape recording of a police interview with the victim,[12] the 911 and all dispatch tapes, certain Polaroid photographs the police took of the defendant upon his arrest, and sketches of his nose purportedly made by Reeves. The defendant's claims do not withstand analysis in the light of the facts in the record.

On November 23, 1987, the defendant filed a motion to preserve evidence requesting in pertinent part a court order to the state and the New Haven police department "to take all reasonable step[s] to preserve all documents, including all tapes, transcriptions or

---

[11] Although the defendant mentions in passing article first, § 8, of the Connecticut constitution, he fails to provide any independent analysis of that provision. We confine our analysis, therefore, to his claims of violations of his federal constitutional rights.

[12] Although in his brief the defendant also claims that the police erased a tape recording of a statement given by Reeves, the record is clear that this tape was preserved and was available to the defendant at the trial.

other recordings of all telephone calls to the police from the complaining witness or any other witness reporting this incident (including 911 calls originally reporting the incident), all dispatcher tapes . . . and any and all other . . . tapes and photographs pertaining to this case . . . ." The court, *Ronan, J.,* granted, in part, this motion on December 7, 1987.[13]

Shortly before the trial, in November, 1990, the defendant filed a motion in limine to prohibit the testimony of the victim and of certain police officers, based upon claims that the police had improperly erased a tape of an interview with the victim and the twenty-four hour reel-to-reel tape recording of all communications with the New Haven police department on October 24, 1987. The pretrial hearing on this motion yielded the following evidence.

In the early morning hours of October 24, 1987, after the abduction of the victim, Reeves went to Yale-New Haven Hospital and reported the incident to a police officer there. After the victim had been released by the defendant, the victim went to a gas station on State Street, where the attendant called the police. The victim testified that she had gotten on the telephone and said, "I just got raped." She further testified that the police had asked her if she were N.W., and when she had responded, "Yeah," the police had said, "We've got Raquel down here now. Where you at?" The station attendant then took the phone and gave the police their location. The victim was then transported by ambulance to the hospital, where she gave a limited description of her abductor.

---

[13] On the same day, the court also granted in part the defendant's seven page motion for discovery and inspection that had been filed on November 23, 1987. Although the defendant adverts to this motion in his brief, he does not cite any specific part thereof that was granted by the court as relevant to this claim.

The following day, Detective Ralph Dinello, of the New Haven police department, interviewed the victim at the hospital. This interview was not tape recorded, but was reflected in Dinello's subsequent report. On October 26, 1987, Dinello interviewed the victim a second time at the hospital. This interview was tape recorded on a cassette recorder.

The cassette tape of the victim's October 26, 1987 interview was later given to Barbara Coughlin for transcription. Coughlin was an administrative assistant in the New Haven police department investigative services unit. In accordance with the procedures in place in 1987, after transcribing the tape Coughlin placed it in Dinello's mail slot. Although Dinello believed he then returned the tape to the evidence room, a search of that room failed to disclose it. In fact, at that time, such tapes were often erased and reused.[14] Thus, although the tape was not available to the defendant, the forty-two page transcript of the interview with the victim was available.

That transcript discloses certain gaps because some parts of the tape were inaudible. Coughlin's practice in transcribing a tape was as follows. If she reached an inaudible part, she would listen to it several times in an attempt to discern what was on it. If she was still unable to hear the words, she would ask someone else in the office to listen to it. If that procedure proved unavailing, she would leave a blank space in the transcript.

The pretrial hearing also disclosed that on November 2, 1987, the victim and Reeves positively identified

[14] This procedure subsequently was changed by the police department, some time in 1988 or 1989. The current procedure is that, after transcription, the tape and its transcript are signed out of the typist's office and brought to the sergeant's office, where they are signed for and logged in by the sergeant. The sergeant then places the tape and transcript into a file and preserves them for use in evidence.

the defendant from a photographic array, and also gave statements that were stenographically recorded. These statements, which were not tape recorded, were available to the defendant. Furthermore, on November 4, 1987, the victim gave another tape recorded statement to the police. Both the twenty-nine page transcript and the tape of this statement were available to the defendant.

Regarding the reel-to-reel tape, Lieutenant Stephen Jankowski testified in the pretrial hearing that he had not received notification that the tape was to be preserved. He further testified that the tape had been erased and reused in its regular rotation, in accordance with the police department's practice in 1987. Thus, this tape was not available to the defendant.

The trial court, *McKeever, J.,* denied the defendant's motion in limine. The court found that, although the tape of the victim's October 26, 1987 interview and the reel-to-reel tape had been intentionally destroyed, they were not destroyed in bad faith. The court also concluded that the unavailability of these tapes did not prejudice the defendant sufficiently to warrant preclusion of the testimony of any witness.

During the trial, two additional matters arose. On the basis of a police report dated November 9, 1987, the defendant discovered that when he had been initially arrested, the police had taken Polaroid photographs of the defendant showing his hands, face and full body, and that the photographs were missing. The defendant moved to dismiss the information, claiming that the missing photographs were "critical for the defendant's use in regard to the identification testimony by all parties in this case." The court denied the motion. The court concluded that the defendant had not been prejudiced because his police "mug shot," taken on the same day, served the same essential pur-

pose as the missing photographs. The court also noted that the defendant could have taken his own photographs at the time.

Also, during the trial Reeves testified that, while she was at the hospital immediately after the abduction, she had "tried to draw [the defendant's] nose, you know, the shape of his nose" on several pieces of paper, but she did not know whether the police had taken the drawings or what had happened to them. Dinello testified that he had not received any sketches from Reeves and could not recall receiving any sketches from other police officers. At no time during the trial did the defendant make a claim or file a motion regarding these purported sketches.

In its instructions to the jury, the court charged, in accordance with the defendant's request, that although the state is not required to produce all the available evidence in the case, if the jury found that there was evidence available only to the state that the state "would naturally have produced," the jury could, but was not required to, draw an inference that the evidence was unfavorable to the state. The court specifically related this instruction "to the audio tapes and photographs" that had not been made available to the defendant.

A

Against this factual background, we turn first to the defendant's claim regarding the tape of the victim's October 26, 1987 statement. The defendant argues that the erasure of that tape "denied the defendant an opportunity to fully cross-examine the victim and the only eyewitness on the inconsistencies in the crucial description of the defendant, the automobile, the apartment, the route [they traveled], and the whereabouts of the house where [the victim] was assaulted," and that the state "has not carried its burden of establishing that

the non-production of this crucial evidence was harmless beyond a reasonable doubt." We disagree.

There is no question that the tape was a "statement" of the victim and, therefore, disclosable to the defendant pursuant to Practice Book §§ 749, 750 and 752. "We have recently set forth the analysis to be applied in such cases. [I]f a case involves intentional, but not bad faith, destruction of the statement of a state's witness, an automatic sanction of striking that witness' testimony is not required. [*State* v. *Williamson,* 212 Conn. 6, 15–16, 562 A.2d 470 (1989)]. *State* v. *Johnson,* 214 Conn. 161, 168, 571 A.2d 79 (1990). Rather, under such circumstances, it is appropriate that the court weigh the culpability of the state for its failure to make disclosable material available on the one hand, against any resulting prejudice to the defendant on the other. *State* v. *Myers,* [193 Conn. 457, 469, 479 A.2d 199 (1984)]; *State* v. *Shaw,* [185 Conn. 372, 386, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982)]. *State* v. *Santangelo,* [205 Conn. 578, 587–88, 534 A.2d 1175 (1987)]; *State* v. *Mullings,* [202 Conn. 1, 10, 519 A.2d 58 (1987)]. *State* v. *Williamson,* supra, 14. This approach gives broad discretion to the trial court. Id. Where . . . the destruction of a witness' statement, although not in bad faith, is deliberate, the state properly bears the burden of establishing harmlessness. Id., 18. . . ." (Internal quotation marks omitted.) *State* v. *Belle,* 215 Conn. 257, 267–68, 576 A.2d 139 (1990). In this context, "bad faith" means " 'a deliberate act done with intent to deprive the defense of information.' " Id., 265 n.8.

Furthermore, absent a showing that the defendant's constitutional right of confrontation was violated by the erasure of the tape, the state need only prove that it was more probable than not that the nonproduction was harmless. Id., 271. Where, however, the state's failure to produce material to which the defendant was

entitled so adversely affects the defendant's ability to cross-examine the witness that it "infringe[s] upon his constitutional right of confrontation," the state must prove harmlessness beyond a reasonable doubt. Id., 269.[15]

The defendant does not challenge the trial court's finding that the erasure of the tape was not done in bad faith. We therefore must determine whether the trial court abused its broad discretion in weighing the state's culpability against the prejudice to the defendant. We conclude that the court did not abuse that discretion in refusing to preclude either the victim or any of the police officers from testifying. We also conclude, contrary to the defendant's claim, that (1) the failure of the state to produce the tape did not deprive him of his right of confrontation, and (2) it is more probable than not that the erasure of the tape was harmless.

The culpability of the state, while not minimal, was not egregious. Contrary to the suggestion of the defendant that the tape was erased "in contempt of

---

[15] In a similar context, we have recently employed a different test to the erasure by the police of a videotape of the defendant's conduct. In *State* v. *Brosnan*, 221 Conn. 788, 608 A.2d 49 (1992), we viewed that erasure to be controlled by *Arizona* v. *Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), as falling within the "contours of the state's duty, under the federal constitution, to preserve *potentially* exculpatory evidence." (Emphasis in original; internal quotation marks omitted.) *State* v. *Brosnan*, supra, 812. That test required the defendant to establish that the police knew of the exculpatory value of the evidence when they lost or destroyed it. Id. We believe, however, that the erasure of the tape recording of a subsequently transcribed statement of a witness should continue to be subject to the standards articulated in *State* v. *Belle*, 215 Conn. 257, 267–68, 576 A.2d 139 (1990), because to a considerable extent the reasons for the *Youngblood* standards do not apply to such an erasure. See *State* v. *Brosnan*, supra, 812 n.21. Unlike the loss or destruction of material the contents of which are unknown, as in *Brosnan*, in this case the transcript gives us good reason to know what the tape contained. Furthermore, whereas in *Brosnan* the police had no explicit obligation to preserve the videotape, in this case the Practice Book clearly imposed such an obligation.

a direct order of the Superior Court," there is nothing in this record to indicate that the tape was erased after December 7, 1987, when the trial court granted the defendant's motion to preserve evidence, or that the police received notice of the order.

Nor is it wholly accurate to state, as the defendant does, that the erasure was "a dramatic illustration of the continued behavior of the New Haven Police Department to destroy evidence . . . in direct contravention of the rulings of the appellate courts of the State." It is true that certain of our cases in which the New Haven police department had lost or erased tape recordings of witnesses' statements predated the conduct of the police in this case. See, e.g., *State* v. *Mullings,* 202 Conn. 1, 5–11, 519 A.2d 58 (1987) (erasure of tape recording of witness' statement harmless error); *State* v. *Myers,* supra, 466–69 (erasure of tape of victim's anonymous telephone call to police harmless error); *State* v. *Shaw,* supra, 384–87 (loss of tape not reversible error because unavailability of tape unintentional and prejudice slight). It is also true, however, that we recognized in *State* v. *Mullings,* supra, 9, that "our holding in *Myers* could reasonably have been interpreted ⌐ excusing the erasure of tapes so long as a verbatim transcript was preserved," and that the decisions in other cases involving the New Haven police department postdated the conduct of the police in this case. See, e.g., *State* v. *Belle,* supra; *State* v. *Johnson,* supra; *State* v. *Kelly,* 208 Conn. 365, 545 A.2d 1048 (1988); *State* v. *Santangelo,* supra, 589–91.

The prejudice to the defendant, moreover, was slight. First, despite the argument of the defendant to the contrary, we can perceive no prejudice resulting from the gaps in the transcript. Considering the pains that Coughlin had taken in attempting unsuccessfully to discern what the victim had said in the inaudible portions of the tape, there is no reason to think that, had the

tape itself been available, the defendant would have been any more successful in discerning that inaudible material. Furthermore, the defendant had available for use in his cross-examination of the victim the forty-two page transcript of that interview, the tape recording and twenty-nine page transcript of her subsequent interview, and the transcript of her pretrial testimony. Thus, "impeachment materials available to the defendant were in ample supply." *State* v. *Joly,* 219 Conn. 234, 247, 593 A.2d 96 (1991). Finally, the court instructed the jury that it could draw an inference adverse to the state from the failure to produce the tape. Under these circumstances, we conclude that the failure to preserve the tape in question did not violate the defendant's right of confrontation, and that it was more probable than not that the erasure of the tape was harmless.

B

We also agree with the state that the erasure of the reel-to-reel tape containing the victim's statement to the police during the telephone call from the gas station was harmless. The only significant statement the victim made in that telephone call was that she had just been raped. That was wholly consistent with all of her pretrial statements and testimony, and with her testimony at the trial. The defendant's suggestion that the loss of this tape hindered his ability to pin down the time of the assault is not supported by the record. There was in evidence a copy of the police complaint card indicating that at 3:56 a.m. Reeves notified the police from Yale-New Haven Hospital that the victim had been abducted. Therefore, the police were already aware of the complaint when the telephone call from the gas station took place. Thus, the trial court did not abuse its discretion in declining to bar the victim's testimony because of the erasure of the reel-to-reel tape.

## C

With regard to the loss of the Polaroid photographs of the defendant, we also agree with the state that the trial court did not abuse its discretion in declining to bar the testimony of any of the policemen. Although the photographs would have been relevant and might have been helpful to the defendant, there is no evidence that they were lost through bad faith on the part of the police. As the trial court noted, the mug shot of the defendant taken on the same day served as something of a substitute for these photographs, and there was nothing to preclude the defendant from having his own photographs of himself taken in order to preserve photographs of his distinctive tattoos for demonstrative evidence later. Furthermore, the defendant was able to cross-examine both the victim and Reeves extensively, and the trial court's instruction, permitting the jury to draw an inference adverse to the state, specifically referred to the photographs. Under these circumstances, the loss of these photographs did not deprive the defendant of his right of confrontation regarding any witness.

## D

Finally, the defendant's unpreserved claim regarding the purported loss of Reeves' sketches of the assailant's nose founders on the first prong of *State* v. *Golding,* 213 Conn. 233, 239, 567 A.2d 823 (1989), namely, that there must be an adequate record to review such a claim. Although Reeves testified that she had tried to draw the defendant's nose, she did not know whether the police had taken her drawings. Dinello testified, however, that he had not received any such sketches and that he could not recall ever receiving such sketches from other police officers. Since the defendant raised no claim at trial regarding this issue,

the trial court had no opportunity to determine whether any such sketches had in fact been made or delivered to the police. Accordingly, the defendant cannot prevail on this claim. Id.

### III

The defendant's final claim is that, with regard to his conviction for failure to appear, the trial court deprived him of due process of law by instructing the jury that the state need not prove an intentional failure to appear. We agree with the defendant that the trial court's instruction was improper, but we also agree with the state that, under the facts of this case, the error was harmless beyond a reasonable doubt.

On February 3, 1988, the defendant had been released on a combined real estate and professional surety bond for the kidnapping and sexual assault charges filed against him. The defendant's grandmother owned the real estate partially securing the bond. Thereafter, he received personal notice, served by a sheriff, of a bond modification hearing scheduled for April 21, 1988. The professional bondsman also specifically told the defendant of the April 21 court date. This was the first scheduled court appearance after his release. On the morning of April 21, the defendant told Zumbo that he would be in court, but he did not appear. Zumbo, the defendant's grandmother and the bondsman appeared in court. The court ordered the bond forfeited and the defendant rearrested.

Thereafter, the defendant telephoned Zumbo several times but refused to tell her where he was. In June, 1988, he picked up Zumbo and her daughter in New Haven and they left the state. When Zumbo told the defendant to turn himself in, he responded that he was afraid of going to jail.

In July, 1988, the defendant was arrested in a motel room in Easton, New York, where he had been staying with Zumbo, and charged with being a fugitive from justice. He told the arresting officers that he would not waive extradition because he did not want to face the pending charges. Two weeks later, he escaped from the county correctional facility in New York, and was captured approximately thirty-six hours later. On May 3, 1989, he was returned to the custody of Connecticut law enforcement officials to stand trial on these charges.

The court instructed the jury that the state was obligated to prove beyond a reasonable doubt the following essential elements of the crime: (1) the defendant had been released on bail upon the condition that he appear personally in court at a future given date; (2) the defendant was required to appear in court on April 21, 1988, in connection with the charges of kidnapping, unlawful restraint and risk of injury to a child; and (3) the defendant wilfully failed to appear as required. In this connection, the court also charged that "an act is done willfully if done knowingly, intentionally, and deliberately."

The court then stated as follows: "You are instructed, however, that the State need not prove an intentional failure to appear. The mere showing by the State that the defendant failed to appear on his scheduled date is sufficient to establish a prima facie case." It is this language, to which the defendant took proper exception, that the defendant claims, and the state does not seriously dispute, improperly "relieved the State of the burden of proving intent or state of mind beyond a reasonable doubt."

We agree with the Appellate Court that "[i]n order to prove the 'wilful' element of General Statutes § 53a-172, the state must prove beyond a reasonable

doubt either that the defendant received and deliberately ignored a notice to appear or that he intentionally embarked on a course of conduct designed to prevent him from receiving such notice." *State* v. *Candito,* 4 Conn. App. 154, 157, 493 A.2d 250 (1985). The challenged language in the court's charge improperly either eliminated wilfulness as an issue or shifted the burden of proof on that issue to the defendant. It therefore ran afoul of the principles of *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), and *Francis* v. *Franklin,* 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985).

As the defendant concedes, however, that determination does not end the inquiry because such an error is harmless if " 'the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " *Rose* v. *Clark,* 478 U.S. 570, 576, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986), quoting *Delaware* v. *Van Arsdall,* 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).[16] This record establishes such harmlessness.

The evidence of the defendant's wilfulness in failing to appear was undisputed and overwhelming. After his release on bond, his professional bondsman twice gave him personal notice of the April 21, 1988 court date. On the morning of April 21 he acknowledged to Zumbo his obligation to appear. Thereafter, he called Zumbo several times but refused to tell her where he was. In June, 1988, he left the state with Zumbo and her daughter, and when she urged him to turn himself in to the

---

[16] We have equated this constitutionally required formulation of the harmless error standard; see *State* v. *Coleman,* 14 Conn. App. 657, 678-81, 544 A.2d 194, cert. denied, 208 Conn. 815, 546 A.2d 283 (1988); with our formulation that an instructional constitutional error is harmless if there is no reasonable possibility that the jury was misled. See *State* v. *Mercer,* 208 Conn. 52, 73-74, 544 A.2d 611 (1988). We perceive no functional difference between the two formulations.

Connecticut authorities, he said that he was afraid of going to jail. After his arrest in New York, he refused to waive extradition because he did not want to face the charges pending against him here, and approximately two weeks later he escaped from jail in New York. Under these circumstances, there is no reasonable possibility that the jury was misled into convicting him without also finding that his failure to appear was wilful.

The judgment is affirmed.

In this opinion PETERS, C. J., SHEA and COVELLO, Js., concurred.

BERDON, J., dissenting. In this case the trial court gave no instruction to the jury on the fallibility of eyewitness identification, notwithstanding that the defendant's sole theory of defense was misidentification. The majority concedes, as it must, that the failure to instruct the jury on the dangers of eyewitness identification[1] was error, but it places the burden on the defendant to prove that it was reasonably probable that the jury was misled by the trial court's failure to so instruct.

Just recently, in *State* v. *Tatum,* 219 Conn. 721, 733 n.18, 595 A.2d 322 (1991), this court made clear that "a trial court's refusal to give *any special* instruction whatsoever on the dangers inherent in eyewitness identification constitutes reversible error where 'the conviction of the defendant [turns] upon the testimony of

---

[1] "In order to make an accurate identification, the eyewitness must observe or perceive the offender's face correctly, retain that complete perception without distortion in memory and retrieve a faithful version of the remembered image when called upon to identify a suspect at some later time. The term 'eyewitness identification' refers to this entire process." Note, "Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification," 29 Stan. L. Rev. 969, 974 n.11 (1977).

eyewitnesses who were uncertain, unclear or inconsist-ent'; *State* v. *Harden,* 175 Conn. 315, 322, 398 A.2d 1169 (1978); *State* v. *Davis,* 198 Conn. 680, 504 A.2d 1392 (1986) . . . ." (Emphasis added.) Surely, at the very least, the eyewitnesses in this case were incon-sistent.[2]

The need for such a bright-line rule is apparent. As Justice Shea wrote for a unanimous court in *Tatum*: "The dangers of misidentification are well known and have been widely recognized by this court and other courts throughout the United States." *State* v. *Tatum,* supra, 733. In *United States* v. *Wade,* 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967), the United States Supreme Court emphasized the dangers inher-ent in eyewitness identification evidence: "[T]he con-frontation compelled by the State between the accused and the victim or witnesses to a crime to elicit iden-tification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagar-ies of eyewitness identification are well-known; the annals of criminal law are rife with instances of mis-taken identification."[3] See also *Simmons* v. *United States,* 390 U.S. 377, 383–84, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968).

In this case, the majority divided the defendant's request to charge on identification into four basic ele-ments: "(1) a focus on the importance of identification

---

[2] See footnote 6 of the majority opinion.

[3] The United States Supreme Court in *United States* v. *Wade,* 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967), further noted that "Mr. Justice Frankfurter once said: 'What is the worth of identification testi-mony even when uncontradicted? The identification of strangers is prover-bially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient crimi-nal procedure.' The Case of Sacco and Vanzetti, 30 (1927)."

as one of the most important issues in the case, and the requirement that the jury be satisfied beyond a reasonable doubt that the defendant was the perpetrator; (2) the capacity and opportunity of the witness to observe the perpetrator; (3) whether the identification of the defendant, *subsequent* to the offense, was the product of the witnesses' own recollection; and (4) an assessment of the credibility of the witnesses under general standards governing credibility." The majority claims that the trial court essentially complied with the defendant's request to charge on identification by making reference to portions of the entire charge, which are taken out of context. So, for example, the majority ingeniously asserts that the first element was satisfied because the trial court "advert[ed]" to that element by giving the general instruction that proof beyond a reasonable doubt is required for conviction. The fact is, no instruction was given on the fallibility of eyewitness identification. Indeed, even the trial court acknowledged as much when, in response to the defendant's exception to the jury charge, it stated the following: "[Y]ou are right in your assessment—I did not give a separate [eyewitness] identification charge because I thought it was abundantly clear to the jury that it was this defendant that they would have to identify [as] being the perpetrator of the crime."

The majority principally relies upon *State* v. *Tillman,* 220 Conn. 487, 600 A.2d 738 (1991), for precedent that the burden rests upon the defendant to prove that the jury was misled by the trial court's failure to instruct the jury on the issue of identification, even though the identification testimony is " 'uncertain, unclear or inconsistent.' " *State* v. *Tatum,* supra, 733 n.18. In *Tillman,* the majority of this court stated that "[e]ven if the [trial] court's instructions were less informative on the risks of misidentification than they might have been," a conviction would be reversed only "if the

defendant could establish that it was reasonably probable that the jury was misled." *State* v. *Tillman,* supra, 501. The holding in *Tillman,* however, is inapposite. In *Tillman, special instructions* were given that "adequately alerted the jury to the factors that it had to assess in determining the reliability of the victim testimony." Id. Therefore, unlike the present case, the trial court in *Tillman* instructed the jury that "in determining whether to credit a witness' testimony, it must assess the witness' 'ability to observe facts correctly.' The [trial] court further said that among the factors the jury was to consider [on the issue of identification] was the witness' 'degree of stress' and 'her opportunity to observe the person.' " Id., 500.

Furthermore, the need for jury instructions on the danger of eyewitness identification and the factors to consider in our multiracial society is essential. In this case, the defendant was white and the complainant and only other eyewitness were black. It is well documented that cross-racial identification is less reliable than identification of one person by another of the same race. "[C]onsiderable evidence indicates that people are poorer at identifying members of another race than of their own. . . . Moreover, counterintuitively, the ability to perceive the physical characteristics of a person from another racial group apparently does not improve significantly upon increased contact with other members of that race. Because many crimes are cross-racial, these factors may play an important role in reducing the accuracy of eyewitness perception." Note, "Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification," 29 Stan. L. Rev. 969, 982 (1977). Elizabeth F. Loftus, in her classic treatise entitled "Eyewitness Testimony," wrote that "[i]t seems to be a fact—it has been observed so many times—that people are better at recognizing faces of persons of their own race than a

different race." E. Loftus, Eyewitness Testimony (1979) pp. 136–37. She concluded, on the basis of an examination of studies made on the subject, that "[p]eople have greater difficulty in recognizing faces of another race than faces of their own race." Id., 139.

We cannot assume that the average juror is aware of the inherent problems of identification, including, inter alia, poor observation conditions, the stressfulness of the situation, the effect of the passage of time between the incident and the identification, the witness' expectations,[4] the witness' personal needs and biases— that is, seeing what he or she wants to see, and the inherent problems of cross-racial identifications. "It would be pleasant, but unduly optimistic, to think that the danger inherent in identification evidence by comparative strangers to the accused is now generally recognized. The fact is that juries do not recognize its unreliable nature." G. Williams, The Proof of Guilt (3d Ed. 1963) pp. 119–20.

Although the *Telfaire* instruction; *United States* v. *Telfaire*, 469 F.2d 552 (D.C. Cir. 1972); leaves much to be desired,[5] the trial court should have at least given this instruction. "The *Telfaire* instruction tells the jury

---

[4] "Expectancy" is defined as the "tendency to perceive the expected." Note, "Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification," 29 Stan. L. Rev. 969, 980 (1977). This is true because "the human mind can process only a small portion of what is visible at any given time, [therefore,] it develops the ability to form conclusions about what has been perceived based on limited amounts of sensory information. It accomplishes this task by integrating fragmentary visual information into existing conceptual schemata based upon a fund of general knowledge acquired over time. In essence, witnesses unconsciously reconstruct what *has* occurred from what they assume *must have* occurred." (Emphasis in original.) Id.

[5] See E. Greene, "Eyewitness Testimony and the Use of Cautionary Instructions," 8 U. Bridgeport L. Rev. 15 (1987) (comparing the effectiveness of the *Telfaire* instruction with a revised cautionary instruction designed for ease of understanding).

to consider in appraising the identification testimony of a witness the adequacy of his opportunity and his capacity to observe the offender; the length of time available for the witness to observe the offender; the proximity of the witness to the offender; whether the witness had seen or known this person in the past; whether the identification was a product of the witness' own recollection; and the credibility of the witness." *State* v. *Davis,* 198 Conn. 680, 685, 504 A.2d 1372 (1986).

The majority argues that I provided no analysis or principle that would support my conclusion that the trial court's failure to furnish the jury with specific instructions on eyewitness identification was reversible error. As I stated at the beginning of my dissent, my analysis is based on a per se rule confirmed by a unanimous court in *State* v. *Tatum,* supra, which consisted of three of the four members of the majority in this case. Again, the rule mandates that it is reversible error for the trial court to refuse to furnish any special instructions to the jury on the fallibility of eyewitness identification when "the conviction of the defendant [turns] upon the testimony of eyewitnesses who were uncertain, unclear or inconsistent." (Internal quotation marks omitted.) Id., 733 n.18. In this case, the conviction of the defendant turned upon the testimony of the eyewitnesses who, as the majority demonstrated in its footnote 6, were uncertain, unclear and inconsistent. Because there were no special identification instructions given, there was reversible error.

Finally, the majority seems to raise an interesting question—that is, whether the trial court should be required to instruct the jury on the dangers of cross-racial identification if requested by the defendant. My answer is simply yes. The scientific evidence of its unreliability is overwhelming and the jury should be made aware of this problem.

A miscarriage of justice could result if we allow the jury to use eyewitness identification evidence without proper guidance from the trial court's instructions alerting the jury to the factors to consider in its evaluation. I would find reversible error in the trial court's failure to give a cautionary instruction on eyewitness identification and remand this case for a new trial. Accordingly, I respectfully dissent.